# IN THE SUPREME COURT OF IOWA

No. 14–2097

Filed June 3, 2016

Amended September 20, 2016

**DAVID LOWELL EVENSON,**

Appellant,

vs.

**WINNEBAGO INDUSTRIES, INC.** and **SENTRY INSURANCE COMPANY,**

Appellees.

Appeal from the Iowa District Court for Winnebago County, Gregg R. Rosenbladt, Judge.

Petitioner appeals from district court judgment affirming on judicial review workers' compensation commissioner's decision. **AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**

Mark S. Soldat of Soldat, Parrish-Sams & Gustafson, PLC, West Des Moines, for appellant.

Steven T. Durick and Joseph M. Barron of Peddicord, Wharton, Spencer, Hook, Barron & Wegman, LLP, West Des Moines, for appellee.

**ZAGER, Justice.**

In this appeal, we are asked to decide whether an employer's matching contributions to an employee's 401k plan should be considered part of weekly earnings for purposes of calculating workers' compensation weekly benefits. We must also decide whether the district court erred in affirming the workers' compensation commissioner's decision on the amount of healing period benefits owed, the extent of permanent disability, and the penalty to be awarded. For the reasons stated below, we conclude that an employer's matching contributions to an employee's 401k plan are not weekly earnings for purposes of calculating workers' compensation weekly benefits. We also conclude the district court did not err in affirming the decision of the commissioner with respect to the extent of permanent disability. However, we hold that the district court erred in affirming the date when healing period benefits commenced, the date when the healing period benefits ended, and the date when permanent partial disability (PPD) benefits commenced. We therefore affirm in part and reverse in part the judgment of the district court. We remand the case to the district court with the following instructions on judicial review: (1) to affirm the commissioner's findings as to the weekly benefit rate and the extent of permanent partial disability and (2) to remand the case to the commissioner for a redetermination of the date when healing period benefits commenced in September 2010, for a redetermination of the date when healing period benefits ended and PPD benefits commenced, and for a recalculation of penalty and interest benefits based on the above dates.

## I. Background Facts and Proceedings.

David Evenson began working at Winnebago Industries, Inc. in 1987 to supplement his income from farming. On May 18, 2010, while

employed at Winnebago, Evenson sustained an injury to his left elbow. Evenson was an hourly employee at the time of his injury. On May 27, Evenson sought treatment for pain in his left elbow. He was seen by James McGuire, PA-C. Evenson reported that the pain in his left elbow started after he was stacking aluminum running boards as part of his job duties. Evenson was diagnosed with left elbow medial epicondylitis. He was provided a brace and advised to avoid lifting running boards until his next appointment. At his next appointment, Evenson reported the pain condition had improved and that he was still working his regular job. At his follow-up appointment on June 10, Evenson reported that his left elbow was sore because he had been doing extra work at Winnebago and working overtime. Although Evenson had full range of motion in his left arm, McGuire restricted him to working eight-hour days, five days per week.

Evenson was also treated by Dr. Carlson. Evenson received a cortisone injection in his left elbow on June 25, and he reported that it reduced his pain significantly. At his follow-up appointment with McGuire, Evenson was told he could continue with his work duties at eight hours per day. At the next appointment, Evenson reported more discomfort with heavy lifting and gripping, but also reported that he had been working ten-hour days. On August 17, Evenson reported he was experiencing more pain in his left elbow while working overtime.

On September 3, Evenson received a second cortisone injection from Dr. Carlson. On the same day, he was also given work restrictions and told not to use his left arm for two weeks. Evenson claims that September 3 is the date when he stopped working, while Winnebago asserts that September 7 is the date that he stopped working. Dr. Carlson made notations on the Winnebago form following the

cortisone injection on September 3 that stated: "OFF 13$^{00}$ 9-3-10 . . . can't accommodate – will give vac. for remainder of day if he chooses or 98 WI – wants Holiday pay so plans to use vac."  Winnebago's records show that Evenson took one hour of vacation pay on September 3 and that there was a plant shut down on the same day for one-half hour. Evenson was also paid eight hours of holiday pay on September 6 for Labor Day.  The records indicate no other vacation pay during the time period between September 3 and September 6.

On September 7, Evenson had a follow-up appointment with McGuire.  McGuire noted some improvement in the left elbow and advised Evenson to avoid tight gripping and heavy lifting with his left arm.  McGuire's office notations from the appointment state that Evenson "was told that there is really no light duty in his work area.  His supervisor wanted to know if there is some other alternative to this; otherwise, he will have to be off work."  The notation goes on to say that Evenson "should be off work for *another* ten days as long as they do not have any light duty for the patient."  (Emphasis added.)

Evenson was eventually referred to Dr. Gibbons, an orthopedic surgeon.  On October 5, after his examination of Evenson, Dr. Gibbons gave Evenson work restrictions to only lift up to twenty pounds continuously; to push, pull, or lift with his left arm only occasionally; and to avoid repetitive tasks.  At a follow-up appointment, Evenson reported that his symptoms were worsening.  Dr. Gibbons restricted Evenson to lifting ten pounds continuously and twenty pounds occasionally, and directed him not to push/pull or handle/grip with his left arm.  Dr. Gibbons lifted these restrictions on January 27, 2011, and Evenson was released to return to his regular duties.  Dr. Gibbons reported that Evenson was at maximum medical improvement (MMI) at

that time. He also noted that he had no impairment rating for Evenson because Evenson retained the full range of motion in his left elbow.

On September 14, 2011, Evenson filed a petition seeking workers' compensation benefits related to the injury to his left elbow. Sentry Insurance Company was the workers' compensation insurer for Winnebago.[1]

In February 2012, Evenson was again seen by McGuire. At this appointment, Evenson complained that he was still having elbow pain and reported numbness and tingling radiating down his arm into the left small and ring fingers. McGuire ordered nerve conduction studies on the left elbow and advised Evenson to limit left hand gripping. The studies showed ulnar neuropathy in Evenson's left elbow and asymptomatic mild median neuropathy in Evenson's left wrist.

Evenson was later treated by Dr. Yanish, another orthopedist. On March 4, Dr. Yanish diagnosed left medial epicondylitis and ulnar nerve impingement. An MRI showed some tendinopathy.

At the request of his attorney, Evenson obtained an independent medical examination and evaluation (IME) from Dr. Kuhnlein in March 2012. The IME addressed not only the nature and extent of the injury to Evenson's left elbow, but also addressed several other body parts and conditions that were separately relevant to his claim against the Second Injury Fund.[2]

---

[1]Evenson also filed a claim for benefits under the Second Injury Fund of Iowa. This claim was subsequently settled. Therefore, this opinion only addresses Evenson's claims against Winnebago and Sentry.

[2]The Second Injury Fund claim involved bilateral foot injuries and left knee injuries. Dr. Kuhnlein was asked to give impairment ratings for the right foot, left foot, and left knee, in addition to Evenson's left elbow.

Dr. Yanish performed surgery on Evenson's left elbow on April 14, after which Evenson underwent physical therapy. Dr. Yanish kept Evenson off work until May 2, but noted that Evenson could not use his left arm upon return to work. On June 10, Evenson reported his pain had improved and he was not experiencing any further numbness or tingling. Dr. Yanish restricted Evenson to not lifting anything over ten pounds with his left arm. In early August, Dr. Yanish changed Evenson's restrictions to not lifting more than twenty pounds with his left arm. Dr. Yanish also found an improved range of motion in Evenson's left elbow. On August 31, Dr. Yanish changed Evenson's restrictions to only occasionally lifting forty pounds, lifting up to twenty pounds repetitively, and only occasionally lifting up to twenty pounds above shoulder level. On October 7, Dr. Yanish released Evenson from treatment and restricted him to no lifting over twenty pounds and no lifting over his shoulder.

A contested hearing was held on July 6, 2012. Both Dr. Yanish and Dr. Kuhnlein offered opinions. Dr. Yanish allocated a four percent permanent impairment to Evenson's left arm and recommended that Evenson restrict lifting, pushing, and pulling with that arm to twenty pounds. Dr. Kuhnlein rated Evenson's permanent arm impairment at three percent and selected June 7, 2011, as the date when Evenson reached MMI.

Some of Evenson's family members testified—over objection—about their observations of his use of his left arm after the injury. Evenson's wife testified that he has difficulty with certain tasks and estimated that he lost sixty percent of the use of his left arm. Evenson's father, his father-in-law, and his sister-in-law testified that he has lost some use of

his left arm. They estimated, respectively, that Evenson lost sixty percent, eighty percent, or fifty-five percent of the function of his left arm.

Evenson also testified regarding the effect of the loss of use of his left elbow to his home life and hobbies. Although he continues to farm, he has scaled back his activities significantly and relies on his family's help. Evenson testified that he is no longer able to steer his farming machinery with his left arm because it is painful and he has trouble gripping the wheel. He is no longer able to care for his horses. Evenson previously broke his horses to ride, but he is no longer able to do so because he cannot properly grip a rope in his left hand. Evenson's wife is now responsible for taking care of the horses. Evenson is no longer able to climb ladders on his farm. Due to his left elbow pain, Evenson stated that he is no longer able to ride his snowmobile or his four-wheeler. Evenson testified that the pain in his left elbow is usually at a constant five on a scale of one to ten.

On August 8, 2012, the deputy commissioner issued his arbitration decision. In the decision, the deputy commissioner awarded Evenson fifty weeks of PPD benefits at the rate of $506.42 per week; healing period benefits between April 14, 2011, and June 14, 2011, at the rate of $506.42; and temporary partial disability (TPD) benefits for a number of time periods[3] based on an average gross weekly rate of compensation of $763.52. The arbitration decision awarded Evenson only part of the cost of the IME performed by Dr. Kuhnlein because a substantial portion of the doctor's evaluation focused on body parts and

---

[3]Evenson was awarded TPD benefits at the weekly rate of $764.53 for the time periods of June 10, 2010, through June 25, 2010; July 13, 2010, through September 2, 2010; October 5, 2010, through December 15, 2010; February 17, 2011, through April 13, 2011; and June 14, 2011, through October 4, 2011.

conditions unrelated to the upper extremity injury claimed by Evenson in this case. The deputy commissioner also concluded the employer contributions to Evenson's 401k plan were a fringe benefit and therefore not included in the calculation of average weekly gross earnings.[4] In determining the extent of Evenson's permanent disability, the deputy commissioner considered not only the impairment ratings determined by the medical testimony, but also the testimony of Evenson's family members. The deputy commissioner concluded that Evenson suffered a twenty percent permanent loss of use in his left arm as a result of the injury in this case.

The deputy commissioner further concluded Evenson is entitled to healing period benefits. In particular, the deputy commissioner found Winnebago paid all healing period benefits owed up to the time of Evenson's surgery in September 2011, but found additional healing periods owed for subsequent time off work were both delayed and insufficient in amount. The deputy concluded that Winnebago must pay a penalty because the "defendants failed to provide reasonable cause or excuse for the delay and denial of healing period and temporary partial disability benefits discussed above and certainly did not provide notice of the reason for such delays and denials."

The deputy stated,

A general award will be made again awaiting more specific calculations of the parties in a manner consistent with this decision. I do not find the use of the weekly rate of

---

[4]The deputy found that Evenson's weekly wage was $763.52, which resulted in a weekly compensation rate of $506.42. If Winnebago's 401k matching contributions were included in the calculation, Evenson's weekly wage would be $771.21, resulting in a weekly compensation rate of $510.43.

compensation of $468.62[5] unreasonable given the considerable fluctuations in claimant's earnings each week. Also, the amount of the penalties shall be only 25 percent of the amounts delayed or denied as there was no showing of any prior violations of law by Winnebago or Sentry Insurance.

Evenson filed a rehearing application, which was denied. Winnebago and Sentry filed a notice of appeal to the Iowa Workers' Compensation Commissioner on September 7, 2012, and Evenson filed a notice of cross-appeal. The commissioner issued an appeal decision on August 2, 2013, affirming the arbitration decision on all issues. Evenson sought judicial review. After a hearing, the district court entered an order on October 14, 2014, affirming the decision of the commissioner. Evenson appealed and we retained the appeal.

## II. Standard of Review.

The first issue in this case asks us to engage in statutory interpretation to determine whether an employer's contribution to an employee's 401k plan is included in the calculation of weekly benefits. We review the commissioner's interpretation of Iowa Code chapter 85 for errors at law. Iowa Code § 17A.19(10)(*c*) (2011); *see Iowa Ins. Inst. v. Core Grp. of Iowa Ass'n for Justice*, 867 N.W.2d 58, 65 (Iowa 2015). We have declined to give deference to the commissioner's interpretation of various provisions included in chapter 85. *Waldinger Corp. v. Mettler*, 817 N.W.2d 1, 7 (Iowa 2012) (holding that the commissioner was not vested with interpretive authority for section 85.34(1)); *Neal v. Annett Holdings, Inc.*, 814 N.W.2d 512, 519 (Iowa 2012) (holding that the commissioner did not have the authority to interpret the phrase "suitable

---

[5]On December 7, 2011, Winnebago and Sentry paid Evenson ten weeks of benefits using the four percent impairment rating given by Dr. Yanish. The rate paid was $468.62 per week plus interest in the amount of $179.58.

work" under section 85.33(3)); *Burton v. Hilltop Care Ctr.*, 813 N.W.2d 250, 261 (Iowa 2012) (explaining that we substitute our own interpretation of sections 85.36 and 85.61(3) if we find the interpretation of the commissioner was erroneous); *Swiss Colony, Inc. v. Deutmeyer*, 789 N.W.2d 129, 133 (Iowa 2010) (explaining that we did not believe the legislature vested the commissioner with the authority to interpret section 85.34(5)).

This case also asks us to determine whether the district court erred in upholding the commissioner's findings regarding healing period benefits, the percentage of disability, and the amount of penalty to be awarded. When we review the commissioner's findings of fact, we apply the following principles:

> The industrial commissioner's findings have the effect of a jury verdict. We may reverse the commissioner's findings of fact only if they are unsupported by substantial evidence in the record made before the agency when the record is viewed as a whole. Evidence is substantial if a reasonable mind would find it adequate to reach the same conclusion. An agency's decision does not lack substantial evidence because inconsistent conclusions may be drawn from the same evidence.

*Coffey v. Mid Seven Transp. Co.*, 831 N.W.2d 81, 89 (Iowa 2013) (quoting *2800 Corp. v. Fernandez*, 528 N.W.2d 124, 126 (Iowa 1995) (citations omitted)). Substantial evidence is "evidence that would be deemed sufficient by a neutral, detached, and reasonable person, to establish the fact at issue when the consequences resulting from the establishment of that fact are understood to be serious and of great importance." Iowa Code § 17A.19(10)(*f*)(1).

**III. Analysis.**

**A. Employer's Contribution to Employee's 401k Account.** The parties disagree whether an employer's matching contributions to an

employee's 401k plan should be included in a weekly rate calculation when determining workers' compensation benefits. This is an issue of first impression for this court. Our determination rests upon the question of whether matching contributions to a 401k plan are considered "spendable weekly earnings" under Iowa Code section 85.61(9).

Iowa Code section 85.37 provides that the weekly benefit amount paid to an employee is based on eighty percent of the employee's "weekly spendable earnings." *Id.* § 85.37. Compensation is based on "the weekly earnings of the injured employee at the time of the injury." *Id.* § 85.36. "Weekly earnings" are defined as "gross salary, wages, or earnings of an employee to which such employee would have been entitled had the employee worked the customary hours for the full pay period in which the employee was injured." *Id.*

"Spendable weekly earnings" are defined as the "amount remaining after payroll taxes are deducted from gross weekly earnings." *Id.* § 85.61(9). "Gross earnings" are defined as

> recurring payments by employer to the employee for employment, before any authorized or lawfully required deduction or withholding of funds by the employer, excluding irregular bonuses, retroactive pay, overtime, penalty pay, reimbursement of expenses, expense allowances, and the employer's contribution for welfare benefits.

*Id.* § 85.61(3).

We must determine whether an employer's matching contributions to an employee's 401k plan are considered weekly earnings for purposes of Iowa's workers' compensation law. When we are asked to interpret a statute, we turn to well-settled rules of statutory interpretation:

> The purpose of statutory interpretation is to determine the legislature's intent. We give words their ordinary and

> common meaning by considering the context within which they are used, absent a statutory definition or an established meaning in the law. We also consider the legislative history of a statute, including prior enactments, when ascertaining legislative intent. When we interpret a statute, we assess the statute in its entirety, not just isolated words or phrases. We may not extend, enlarge, or otherwise change the meaning of a statute under the guise of construction.

*Branstad v. State ex rel. Nat. Res. Comm'n*, 871 N.W.2d 291, 295 (Iowa 2015) (quoting *Schaefer v. Putnam*, 841 N.W.2d 68, 75 (Iowa 2013)). "We also consider the statute's 'subject matter, the object sought to be accomplished, the purpose to be served, underlying policies, remedies provided, and the consequences of the various interpretations.' " *Id.* (quoting *Cox v. State*, 686 N.W.2d 209, 213 (Iowa 2004)).

We first look at the ordinary meaning of certain words contained in the workers' compensation statutes. Section 85.36 defines "weekly earnings" as including "gross salary, wages, or earnings." Iowa Code § 85.36. "Salary" is defined as the "fixed compensation paid regularly (as by the year, quarter, month, or week) for services." *Salary, Webster's Third New International Dictionary* (unabr. ed. 2002). "Wage" is defined as

> a pledge or payment of usu. monetary remuneration by an employer esp. for labor or services usu. according to contract and on an hourly, daily, or piecework basis and often including bonuses, commissions, and amounts paid by the employer for insurance, pension, hospitalization, and other benefits.

*Wage, Webster's Third New International Dictionary.* "Earnings" are defined as "something (as wages or dividends) earned as compensation for labor or the use of capital." *Earnings, Webster's Third New International Dictionary.*

An employer's contribution to a 401k plan is not dependent upon the hours an employee works in the normal way we think of the wage or

salary an employee earns for working a certain number of hours or days. An employee's 401k plan is related, at least tangentially, to his or her wage or salary, in that the amount the employee chooses to contribute may be based on how much they earn. However, an employer's 401k plan matching contributions are based on an employee's choice and participation. Ultimately, an employee chooses whether and how much to participate in a 401k plan. After the employee chooses, then the employer matches the contribution to the plan. The portion the employee chooses to contribute certainly comes from his or her normal salary or wage. The added contribution from any match by the employer, however, does not.

It is clear from the ordinary meaning of the words salary, wage, and earnings that an employer's matching contribution to an employee's 401k plan is not meant to be included in weekly earnings for purposes of our workers' compensation statute. When we read the dictionary definitions in conjunction with the exclusionary language contained in our statute, we conclude our legislature intended to exclude employer contributions to 401k plans from the definition of gross earning. *See* Iowa Code § 85.61(3) (specifically excluding "irregular bonuses, retroactive pay, overtime, penalty pay, reimbursement of expenses, expense allowances, and the employer's contribution for welfare benefits" from the regular definition of gross earnings).

Evenson contends an employer's matching contributions to a 401k plan are not welfare benefits, and they therefore should not be excluded from gross earnings under section 85.61(3). We disagree. The ordinary meanings of the terms salary, wage, and earnings inform our interpretation of the term "welfare benefits" in this context. *See id.* (defining gross earnings as "recurring payments by

employer to the employee for employment, before any authorized or lawfully required deduction or withholding of funds by the employer, excluding . . . welfare benefits"). A "benefit" is defined as "financial help in time of sickness, old age, or unemployment" and "a cash payment or service provided for under an annuity, pension plan, or insurance policy." *Benefit, Webster's Third New International Dictionary.* "Welfare" is defined as "the state of faring or doing well . . . thriving or successful progress in life . . . a state characterized esp. by good fortune, happiness, well-being, or prosperity." *Welfare, Webster's Third New International Dictionary.* The term included in the statute is "welfare benefits," and the two words should be considered together. Together, welfare benefits can mean something extra given to an employee for their well-being. We conclude a tax-deferred fund often utilized by employees as a substitute for, or in addition to, an established retirement plan clearly falls under the definition of welfare benefits.

The statute contemplates that there may be welfare benefits given to employees that are separate and distinct from their normal weekly earnings. *See* Iowa Code § 85.61(3). Matching contributions to an employee's 401k plan fall under this category. As discussed above, we conclude that a 401k plan falls outside the normal definition of wage, salary, or earnings. An employer's matching contributions to a 401k plan are something extra, in addition to an employee's normal, earned wages. They provide assistance for employees in planning for retirement. An employer's contribution to an employee's retirement account is a benefit (something extra given by an employer) for the welfare of an employee (that employee's well-being, specifically in regard to prosperity). Thus, under the ordinary meaning of the terms, we conclude an

employer's matching contribution to an employee's 401k plan is a welfare benefit under the statute.

Further, Iowa Code section 85.61 defines "spendable weekly earnings" as "that amount remaining after payroll taxes are deducted from gross weekly earnings." Iowa Code § 85.61(9). As a deferred compensation plan, an employer's matching contribution to an employee's 401k plan is not subject to payroll taxes in a manner that would fall under the statutory definition. An employee who receives a matching contribution to their 401k plan cannot immediately spend the contribution at the time it is paid, unlike a regular weekly wage.

The leading Supreme Court case on fringe benefits is *Morrison-Knudsen Construction v. Director, Office of Workers' Compensation Program,* 461 U.S. 624, 103 S. Ct. 2045, 76 L. Ed. 2d 194 (1983). In this case, the Court held that an employer's contributions to a union trust fund for health and welfare, pensions, and employee training were not considered wages for the purposes of calculating weekly benefits under the District of Columbia's Workers' Compensation Act. *Id.* at 637, 103 S. Ct. at 2052–53, 76 L. Ed. 2d at 204. In so deciding, the Supreme Court relied on the fact that the health and welfare, pension, and training funds could not be readily converted to a cash equivalent in the same way as regular wages or the reasonable value of lodging. *Id.* at 630, 103 S. Ct. at 2048–49, 76 L. Ed. 2d at 199. The Court also noted that the legislative history indicated that Congress did not intend to include these types of fringe benefits when calculating the rate of compensation benefits. *Id.* at 632, 103 S. Ct. at 2050, 76 L. Ed. 2d at 201.

The majority trend is to treat an employer's matching contribution to a 401k plan as a welfare benefit that falls under the category of "fringe benefits," and thus is not included in the calculation of weekly benefits

for workers' compensation purposes. 8 Arthur Larson et. al., *Larson's Workers' Compensation Law* § 93.01[2][b], at 93-20 (rev. ed. 2015); *cf. City of Lamar v. Koehn*, 968 P.2d 164, 167 (Colo. App. 1998) (excluding an employer's contribution to an employee's pension plan from the calculation of weekly benefits); *Luce v. United Techs. Corp.*, 717 A.2d 747, 755 (Conn. 1998) (finding that the calculation of "wages" under the state's workers' compensation laws does not include pensions); *Rainey v. Mills*, 733 S.W.2d 756, 758 (Ky. Ct. App. 1987) (declining to find statutory support to include fringe benefits, such as employer pension plan contributions, in weekly wage calculation); *Barnett v. Sara Lee Corp.*, 627 A.2d 86, 90–91 (Md. Ct. Spec. App. 1993) (finding that pension plans could not be considered in the calculation of weekly wages for the purpose of determining a claimant's industrial loss of use); *In re Gagnon*, 965 A.2d 1154, 1159 (N.H. 2009) (holding that weekly wages are calculated using a claimant's pre-tax pay and, therefore, it was not unjust for the collective bargaining agreement to exclude employer payments to an employee's pension plan from the definition of wage); *Shaw v. U.S. Airways, Inc.*, 665 S.E.2d 449, 453 (N.C. 2008) (holding that an employer's contributions to an employee's retirement account are not included in the calculation of a weekly wage for workers' compensation purposes); *Clopton v. City of Muskogee*, 147 P.3d 282, 284–85 (Okla. Civ. App. 2006) (relying on *Morrison-Knudsen* in determining that pension plans are not included in the definition of wage for workers' compensation purposes); *Nelson v. SAIF Corp.*, 714 P.2d 631, 631–32 (Or. Ct. App. 1986) (finding that pensions are not included in the definition of wages included in Oregon's workers' compensation laws).

We acknowledge that a few states have changed their workers' compensation statutes to include retirement plans in the definition of fringe benefits. *See, e.g.*, Neb. Rev. Stat. Ann. § 48-1229 (West, Westlaw

current through 2016 2d Reg. Sess.). Our legislature has not taken such action, and we agree with the majority trend evidenced by the cases cited above. An employer's matching contributions to an employee's 401k plan fit much more squarely into the fringe-benefits category than that of a regular salary or wage. As discussed earlier, those contributions are not directly linked to an employee's salary, nor are they immediately available for the employee to spend in the same way as regular wages. We conclude the commissioner and the district court were correct in declining to expand the definition of weekly spendable earnings to include employer 401k contributions.

**B. District Court Judgment.** Evenson also claims that the district court erred by affirming the commissioner's decision regarding the extent of his scheduled member disability, the commencement dates of healing period benefits, and the amount of penalty awarded. We address each argument in turn to determine whether the commissioner's findings of fact were supported by substantial evidence. *See, e.g.*, *Coffey*, 831 N.W.2d at 89.

1. *Extent of disability.* An injury to the elbow is a scheduled injury (to the arm) with a maximum benefit period of 250 weeks. Iowa Code § 85.34(2)(*m*). The compensation for a scheduled injury is based on the impairment of bodily function. *Westling v. Hormel Foods Corp.*, 810 N.W.2d 247, 252 (Iowa 2012). "[I]t is a fundamental requirement that the commissioner consider all evidence, both medical and nonmedical. Lay witness testimony is both relevant and material upon the cause and extent of injury." *Gits Mfg. Co. v. Frank*, 855 N.W.2d 195, 199 (Iowa 2014) (quoting *Miller v. Lauridsen Foods, Inc.*, 525 N.W.2d 417, 421 (Iowa 1994)).

In this case, the deputy considered opinions offered by Dr. Yanish, who rated Evenson's functional impairment at four percent, and Dr. Kuhnlein, who rated Evenson's functional impairment at three percent. The deputy also heard testimony from various family members about the injury suffered by Evenson. Based on all of the testimony, the agency found Evenson suffered a twenty percent permanent loss of the use of his left arm. In making this determination, the agency considered all of the expert medical opinions as well as the testimony of Evenson's family members. The district court found substantial evidence supporting the agency's determination on the extent of Evenson's disability. On appeal, Evenson contends the commissioner's disability finding is not supported by substantial evidence and contends he suffered a twenty-one to fifty percent disability in his left arm.

In this case, the deputy heard and considered medical opinions, opinions of family members, and the testimony of Evenson himself. In our review of the record, we find substantial evidence supporting the agency's finding on disability and therefore affirm the district court's ruling on judicial review.

2. *Healing period benefits.* Evenson alleges that the commissioner incorrectly determined the commencement dates for healing period and PPD benefits. The commissioner determined that Evenson had two different compensable healing periods. The first was from September 7, 2010, to September 19, 2010. The second was from April 14, 2011, to June 14, 2011. The arbitration decision awarded Evenson PPD benefits beginning on November 30, 2011. This was based on Dr. Yanish's impairment rating that placed Evenson at MMI on November 29, 2011. Both the commissioner and the district court affirmed that commencement date for PPD benefits.

Evenson contends his first healing period began on September 3, rather than September 7. He argues that he first received physical restrictions on September 3 and Winnebago was unable to accommodate his restrictions at that time. Therefore, he was required to be off work beginning on September 3. Dr. Carlson's progress note reported that Evenson planned to take vacation pay because Winnebago was unable to accommodate his restrictions. McGuire's progress note for September 7 stated that Evenson should be off work for *another* ten days, suggesting that Evenson had already been off work before that appointment. Further, Winnebago's records show that Evenson took one hour of vacation pay on September 3 and that there was a one-half hour plant shut down on the same day. Evenson was also paid eight hours of holiday pay on September 6 for Labor Day. We agree with Evenson that substantial evidence does not support the commissioner's finding that the first healing period began on September 7.

Generally, an employer may seek a credit for the good faith overpayment of workers' compensation benefits. Iowa Code § 85.34(4)–(5); *see also* 15 James R. Lawyer, *Iowa Practice: Workers' Compensation* § 13:10, at 175 (2015) [hereinafter *Iowa Practice*]. Additionally, the commissioner allows credits for sick pay and vacation pay in some situations. *Iowa Practice*, at 175–76; *see also King v. Marion Indep. Cmty. Sch. Dist.*, Iowa Workers' Comp. Comm'n, 2013 WL 3185066, at *2–3 (June 10, 2013). If an employee elects to use sick pay or vacation pay during a time in which workers' compensation benefits are not being paid, an employer is not entitled to a credit for the pay unless the employee later elects to have the vacation or sick pay restored. *Iowa Practice*, at 176.

Conversely, the commissioner has generally allowed an employer a credit against healing benefits in the amount of holiday pay paid to an employee during a healing period. *See, e.g.*, *King*, 2013 WL 3185066, at *2. The rationale for treating vacation and sick pay differently than holiday pay is that sick pay and vacation pay are paid leave that an employee accrues over time for previous work that the employee performed. *See id.* The employee who uses vacation or sick pay as compensation during a healing period loses the future ability to utilize such benefits for their intended purpose. If an employer is granted a credit for paying an employee for sick or vacation pay that the employee elected to take during a time when the employer should have been paying workers' compensation benefits, then the cost is shifted to the employee rather than the employer. *See id.* In contrast, there is not a cost to the employee when they take holiday pay. *See id.* Holiday pay is not something an employee accrues and can use in the future; it is a benefit that is given independent of the employee's hours worked or choice to take a paid day off. *See id.* We agree with the approach the commissioner has taken on this issue. If, on remand, the commissioner determines the first healing period began on September 3, then the holiday pay Evenson was paid for September 6 may be credited against Winnebago's obligation to pay additional healing period.

Evenson also argues that the commissioner should have awarded PPD benefits beginning on September 20, the day he returned to work after the first healing period, and then suspended those benefits during his second healing period between April 14, 2011, to June 14, 2011, and recommended PPD benefits on June 15, 2011.

Iowa Code section 85.34 provides the standard for determining when healing period benefits terminate. Iowa Code § 85.34(1). We have

recognized that the statute presents a menu of options the fact finder shall consider when deciding that the healing period has ended. *See, e.g., Waldinger Corp.*, 817 N.W.2d at 8–9. Section 85.34 provides that the healing period lasts

> until the employee has returned to work or it is medically indicated that significant improvement from the injury is not anticipated or until the employee is medically capable of returning to employment substantially similar to the employment in which the employee was engaged at the time of injury, whichever occurs first.

Iowa Code § 85.34(1) (emphasis added). We have previously recognized that there may be more than one healing period for a single injury. *Waldinger Corp.*, 817 N.W.2d at 8.

"Compensation for permanent partial disability shall begin at the termination of the healing period . . . ." Iowa Code § 85.34(2). When there are multiple healing periods, we must determine whether PPD begins to run from the end of the first healing period or whether the fact finder may choose among the multiple healing periods that are supported by substantial evidence, as occurred here. We hold that the statute clearly states the healing period lasts until whichever situation *occurs first. Id.* § 85.34(1); *see also Teel v. McCord*, 394 N.W.2d 405, 407 (Iowa 1986). In this case, the first of the three alternative events to occur was Evenson's return to work in September 2010.

The commissioner found Evenson returned to work on September 20, 2010, after several days off. This ended the first healing period as a matter of law because it was the earliest of the section 85.34(1) alternatives and because PPD "shall begin at the termination of the healing period provided in subsection 1 [of section 85.34]." Iowa Code § 85.34(1)–(2). Because we conclude the first healing period ended on September 20, there is not substantial evidence in the record to support

the commissioner's finding the healing period benefits terminated in November 2011. *See Teel*, 394 N.W.2d at 406–07 (concluding a claimant's entitlement to PPD benefits commenced when the claimant first returned to work after his 1974 injury—not after subsequent intermittent healing period or after he finally "returned to work for good" in 1981 after a series of surgeries). The date of Evenson's first return to work established the end of the healing period and the commencement of PPD benefits because it was the earliest of the three triggering events prescribed in section 85.34(1). Iowa Code § 85.34(1).

Our determination that Evenson's return to work in September 2010 established the commencement date for PPD benefits is not precluded by the fact that he was entitled to TPD benefits for subsequent weeks when he was medically restricted from working his regular hours. In *Presthus v. Barco, Inc.*, the claimant received healing period benefits after a work-related injury. 531 N.W.2d 476, 480 (Iowa Ct. App. 1995). He returned to work, but for approximately three weeks was unable to work regular full-time hours and received TPD benefits. *See id.* Presthus contended his entitlement to PPD benefits commenced upon his return to work, which was the same time he would begin receiving TPD benefits. *Id.*[6] The commissioner held PPD benefits commenced at a later date—after the short period of temporary partial disability. *Id.* The district court and court of appeals concluded on judicial review that the commissioner correctly delayed the commencement of PPD benefits until the termination of the period of temporary partial disability. *Id.* at 480–81.

---

[6]Iowa Code section 85.34(2) (1993) provided that "[c]ompensation for permanent partial disability shall begin at the termination of the healing period provided in [section 85.34(1)]."

The court of appeals concluded Presthus could not "receive temporary partial and permanent partial benefits for the same injury at the same time" because it believed he could not be "both temporarily and permanently disabled at the same time." *Id.* at 480. This language from the *Presthus* opinion was imprecise and requires clarification. In the world of workers' compensation, the words "temporary" and "permanent" have different meanings in different contexts. In a *medical* sense, the court of appeals could have reasoned that Presthus's injury was not both temporary and permanent in nature at the same time. Yet, the terms "temporary" and "permanent" have different meanings and significance when used in describing the several categories of workers' compensation benefits employees receive for work-related injuries.

Some categories of compensation authorized under Iowa Code chapter 85 are for the purpose of compensating injured employees during weeks when they experience a temporary total or partial loss of actual earnings (reduced or eliminated paychecks) caused by the injury. *See* Iowa Code § 85.33(1) (providing for temporary total disability (TTD) benefits for time lost from work for an injury that does not result in a permanent disability); *id.* § 85.33(2) (providing for TPD benefits during periods when the employee cannot return to work substantially similar to the job performed at the time of the injury, but is able to perform other work consistent with the injury); *id.* § 85.34(1) (providing for healing period benefits for time lost from work for an injury that results in permanent partial disability). Other categories of workers' compensation benefits serve distinctly different purposes and are owed when an employee sustains an injury that causes a *permanent* partial loss of either bodily function (scheduled member injuries compensated under section 85.34(2)(*a*)–(*t*)), or earning capacity (body-as-a-whole injuries

compensated under section 85.34(2)(*u*)), or when the employee sustains a permanent total loss of earning capacity under section 85.34(3). *Id.* § 85.34. So, unlike in the medical world in which an injury is ultimately either temporary *or* permanent, in the workers' compensation world, a single injury can result in an employer's liability for both temporary and permanent disability benefits.

As we have noted, the various categories of workers' compensation benefits have distinct purposes. Thus, because TPD and PPD benefits compensate for completely different categories of losses, an employee who receives TPD and PPD benefits following a single workplace injury is not paid twice for the same injury or loss. Perhaps in an effort to avoid even the misapprehension that Presthus might be paid more than he was entitled if he simultaneously was owed TPD and PPD benefits for a single work-related injury, the commissioner in *Presthus* chose to commence the claimant's entitlement to PPD benefits after a brief period of TPD benefits concluded. *Presthus*, 531 N.W.2d at 478. The court of appeals affirmed that part of the agency's decision on appeal, concluding Presthus could not receive temporary and permanent disability payments at the same time for the same injury. *Id.* at 480. We now conclude *Presthus* was wrongly decided.

In this case, Evenson's entitlement to PPD benefits commenced when he first returned to work because that is when his entitlement to healing period benefits ended. *See* Iowa Code § 85.34(1)–(2) (providing healing period benefits are owed "until the employee has returned to work or it is medically indicated that significant improvement from the injury is not anticipated or until the employee is medically capable of returning to employment substantially similar to the employment in which the employee was engaged at the time of injury, *whichever occurs*

*first*," and stating "[c]ompensation for permanent partial disability shall begin at the termination of the healing period" (emphasis added)). Because TPD benefits were paid to Evenson *after* he first returned to work following the injury, we conclude the commencement of Winnebago's obligation to pay PPD benefits cannot be delayed until after the TPD benefits subsequently terminated under the plain meaning of section 85.34.

Our conclusion that Evenson's entitlement to PPD benefits was not suspended beyond the end of the first healing period until after his period of temporary partial disability ended poses no risk of duplication or overpayment of benefits under the circumstances presented here. As we have noted, TPD payments are calculated to replace part of Evenson's loss of actual earnings after he returned to work during a period of partial disability. The PPD payments, by contrast, are intended to compensate him for a different loss: a permanent partial loss of his left arm. Thus, although we conclude today that PPD payments can be owed for periods during which a claimant was paid temporary partial disability, no duplication of benefits arises. Our conclusion on this point is also based in part on the fact that the principal purpose of the statutory scheme establishing a date (the termination of the healing period) for the commencement of PPD benefits is the calculation of interest owed on such benefits for the duration of any delay of payment. *See, e.g., Teel*, 394 N.W.2d at 407 (explaining that interest on PPD benefits was owed from Teel's first return to work on May 7, 1974—even though he experienced subsequent intermittent healing periods and the extent of his disability was not known until 1980—because "the employer in effect [was] holding [Teel's] money, and presumably earning interest on it").

We remand for a determination of whether the first healing period began on September 3 or September 7. On remand, the commissioner shall also make a new determination of the date PPD benefits commenced consistent with this opinion.

3. *Amount of penalty.* Iowa Code section 86.13(4) provides that, if a delay in payment occurs without reasonable or probable cause or excuse known to the employer, the commissioner shall award a penalty in an amount up to fifty percent of the amount of benefits denied, delayed, or terminated without such reasonable or probable cause or excuse. Iowa Code § 86.13(4)(*a*). The arbitration award determined that a twenty-five percent penalty was appropriate in this case, stating that

> defendants failed to provide reasonable cause or excuse for the delay and denial of healing period and temporary partial disability benefits discussed above and certainly did not provide notice of the reason for such delays and denials. A general award will be made again awaiting more specific calculations of the parties in a manner consistent with this decision. I do not find the use of the weekly rate of compensation of $468.62[7] unreasonable given the considerable fluctuations in claimant's earnings each week. Also, the amount of the penalties shall be only 25 percent of the amounts delayed or denied as there was no showing of any prior violations of law by Winnebago or Sentry Insurance.

The commissioner's appeal decision adopted the penalty determination, concluding as follows:

> The arguments of the parties have been considered and the record of evidence has been reviewed de novo.
>
> Pursuant to Iowa Code sections 86.24 and 17A.15, I affirm and adopt as the final agency decision those portions of the proposed arbitration decision filed on August 21, 2012 that relate to issues properly raised on intra-agency appeal.

---

[7]On December 7, 2011, Winnebago and Sentry paid Evenson ten weeks of benefits based on the four percent impairment rating given by Dr. Yanish. The rate paid was $468.62 per week plus interest in the amount of $179.58.

> The calculations of claimant as to healing period benefits, temporary partial disability benefits, princip[al]/interest owed, and penalties assessed are adopted as if fully set forth herein.

The district court considered the penalty imposed by the commissioner. It considered that Winnebago and Sentry had failed to include interest on some benefits and had failed to show reasonable or probable cause for a delay in paying some benefits. It also considered that the deputy found the weekly rate paid by Winnebago and Sentry prior to the arbitration decision was not unreasonable based on the impairment rating provided by Dr. Yanish. It noted that Winnebago did not have a history of delayed payments. The district court noted that the penalty amount imposed was half that allowed by the pertinent Code section. The court concluded that this was not a case of extreme denial or delay and held there was substantial evidence in the record to support the twenty-five percent penalty award. We agree with the decision of the district court that twenty-five percent of the delayed and underpaid benefits is the proper penalty amount. However, because we remand for a recalculation of the healing period and PPD benefits owed, we also remand for a recalculation of the amount of the penalty and interest owed based on the new healing period and PPD dates.

## IV. Conclusion.

We hold that an employer's matching contributions to an employee's 401k plan are not spendable weekly earnings for purposes of calculating weekly workers' compensation benefits, and we therefore affirm the commissioner's determination of Evenson's weekly compensation rate. We also hold substantial evidence in the record supports the commissioner's determination of the extent of Evenson's work-related disability. We reverse the commissioner's determination of

the commencement date for healing period benefits in September 2010 and his related determination of the commencement date for PPD benefits. We remand this case to the district court with the following instructions: (1) to affirm the commissioner's findings as to the weekly benefit rate and the extent of permanent partial disability and (2) to remand the case to the commissioner for a redetermination of the date when healing period benefits commenced in September 2010, for a redetermination of the date when healing period benefits ended and PPD benefits commenced, and for a recalculation of penalty and interest benefits based on the above dates.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**

All justices concur except Mansfield and Waterman, JJ., who concur in part and dissent in part.

#14–2097, *Evenson v. Winnebago*

**MANSFIELD, Justice (concurring in part and dissenting in part).**

I join most of the court's well-reasoned opinion, but differ as to when permanent partial disability benefits should begin.

I would affirm the commissioner's determination that David Evenson "achieved maximum medical improvement [MMI] on November 29, 2011" and that permanent partial disability benefits should commence on November 30 of that year. In declining to uphold this determination, my colleagues overturn existing law which had prohibited claimants from receiving temporary partial disability benefits and permanent partial disability benefits for the same injury over the same time period. *See* 15 James R. Lawyer, *Iowa Practice Series: Workers' Compensation* § 13:2, at 141 (2015).

My colleagues do not dispute that substantial evidence supports the factual finding of a November 29, 2011 MMI. Instead, they reverse on a legal ground—essentially by dramatically expanding the prior holding of *Waldinger Corp. v. Mettler*, 817 N.W.2d 1 (Iowa 2012). Prior to *Waldinger*, the law had been that MMI strictly demarcated the line between (1) the termination of temporary partial disability or healing period benefits and (2) the commencement of permanent partial disability benefits. *See Ellingson v. Fleetguard, Inc.*, 599 N.W.2d 440, 447 (Iowa 1999), *overruled by Waldinger*, 817 N.W.2d at 8.

In *Waldinger*, we carved out an exception for the situation when the employee needs another surgery for his or her work-related injury after attaining MMI. *See* 817 N.W.2d at 8. There the claimant had attained MMI for an ankle injury in 2005, but missed three months of work in 2007 due to arthroscopic surgery for the same work-related injury. *Id.* at 3–4. The court of appeals held that the claimant was not

entitled to healing period benefits for the time he missed work in 2007 because he had already achieved MMI in 2005. *Id.* at 4. This court disagreed, concluding that "the phrase 'a healing period' was not intended by the legislature to limit healing period benefits to a single period of temporary disability per injury." *Id.* at 8. Thus, we overruled *Ellingson* in part, holding:

> We now conclude our interpretation in *Ellingson* of section 85.34(1) as a categorical prohibition of an award of healing period benefits for disability from work occurring after the date MMI has been achieved was erroneous, and we therefore overrule it.

*Id.* We continued,

> When, after achieving MMI, a claimant is rendered temporarily disabled from work, as Mettler was, as a consequence of surgical treatment provided under section 85.27 for a work-related injury, a new healing period begins under section 85.34(1).

*Id.* We added, "We see no principled reason why Mettler, or any similarly situated claimant, should be disqualified from a healing period remedy when ordinary and necessary medical care for a work-related injury temporarily removes them again from the work force." *Id.* at 8–9.

Today's decision is an illogical and ill-considered expansion of *Waldinger*. Contrast the *Waldinger* facts with the situation here. In the present case, Evenson suffered a work-related left elbow injury in May 2010. He was off work in September 2010 and again from April to June 2011. He achieved MMI in November 2011. The commissioner awarded Evenson the following:

> (1) healing period benefits for the two time spans he was off work in September 2010 and April-June 2011,[8]

---

[8]As noted by the majority, clarification is needed regarding September 3–7, 2010.

(2) temporary partial disability benefits compensating for various time periods between June 2010 and October 2011 prior to the attainment of MMI when Evenson was working at his prior job but could not earn overtime compensation because of his condition, and

(3) permanent partial disability benefits as of the attainment of MMI in November 2011.

Thus, unlike *Waldinger*, this is not a case where the claimant achieved MMI, became eligible for PPD benefits, but then had a subsequent episode where he missed time from work because of medical treatment for the same work-related injury. Rather, the claimant—prior to attaining MMI—had a combination of time off work and reduced hours for which he already has been given compensation through a combination of healing period benefits and temporary partial disability benefits. I see no unfairness in the outcome approved by the commissioner. Yet the court now holds that Evenson is also entitled to PPD benefits dating back to when he returned to work on September 20, 2010.

There are several problems with what the court has done. To begin with, it is inconsistent with the statutes. Iowa Code section 85.34(1) (2011) regarding "healing period" provides that the healing period begins on the first day of disability following the injury and continues

until the employee has returned to work or it is medically indicated that significant improvement from the injury is not anticipated or until the employee is medically capable of returning to employment substantially similar to the employment in which the employee was engaged at the time of injury.

Section 85.34(2) provides, "Compensation for permanent partial disability shall begin at the termination of the healing period provided in subsection 1." *Id.* § 85.34(2). Section 85.33(2) provides that temporary partial disability benefits are "payable, in lieu of temporary total

disability and healing period benefits, to an employee because of the employee's temporary partial reduction in earning ability as a result of the employee's temporary partial disability." *Id.* § 85.33(2).

Putting these statutes together, they indicate that when an employee is receiving temporary partial disability benefits because he or she is working fewer hours due to a workplace injury, this time period is regarded as part of "the healing period" for section 85.34 purposes, and only at the conclusion of this overall healing period would permanent partial disability benefits commence. That is why the temporary partial benefits are "in lieu of" healing period benefits. *See id.* In fact, the words "in lieu of" in the statute make no sense otherwise. In short, when an employee like Evenson suffers a workplace injury and thereafter has a combination of time off work and reduced hours until he achieves MMI, that entire pre-MMI time period is treated as "the healing period" for purposes of determining when PPD benefits commence.

The majority's reading of the statutes also means an employee can have a "temporary" disability and a "permanent" disability based on the same injury at the same time. This seems to be a very incongruous reading of the statutes and one that should be avoided. Additionally, the majority fails to explain why the legislature expressly provided that an employee could receive medical and death benefits "in addition to" PPD benefits, *see id.* § 85.34(2) ("The compensation shall be in addition to the benefits provided by sections 85.27 and 85.28."), but did not say an employee could receive temporary disability payments in addition to PPD benefits. Surely, if the legislature wanted to indicate that an employee could receive temporary partial disability benefits and PPD benefits covering the same time period, it would have expressly said so, given that it made express reference to the availability of benefits under sections

85.27 and 85.28—situations where the case for awarding additional benefits is far clearer.

As I've already suggested, the majority's approach leads to a questionable policy outcome—namely, the duplication of benefits. Evenson has already been awarded temporary partial disability benefits for the time period before November 2011 to compensate for any "partial reduction of earning ability" during that time. *See* Iowa Code § 85.33(2). Now the court wants the commissioner to go back and further compensate him for any loss of earning capacity *during the same period.* Until now, our law had been clear:

> In this particular case, Presthus was receiving both temporary partial and permanent partial benefits for the same injury. It follows that, in order to receive both benefits at the same time as Presthus suggests, Presthus' injury would have to cause him to be both temporarily and permanently disabled at the same time. We are not persuaded that such a result is attainable. We conclude Presthus cannot receive temporary partial and permanent partial benefits for the same injury at the same time.

*Presthus v. Barco, Inc.*, 531 N.W.2d 476, 480 (Iowa Ct. App. 1995). In *Presthus,* no PPD benefits commenced until "after all of the temporary partial benefits had been paid"—exactly the rule that I contend should be followed here. *Id.*

*Presthus* is not the only decision that the court overrules today. The court also discards the analytical framework we set forth in considerable detail in one of our own opinions just six years ago. In 2010, in *Bell Brothers Heating & Air Conditioning v. Gwinn,* we explained the interplay between temporary and permanent disability awards. 779 N.W.2d 193, 200–01 (Iowa 2010). We said,

> Although early workers' compensation law made no distinction between temporary and permanent disability, our workers' compensation law now provides for separate awards

based on the temporary and permanent nature of a disability. The difference between awards for temporary and permanent disability can be best illustrated by considering a typical industrial injury.

Normally, an industrial injury gives rise to a period of healing accompanied by loss of wages. During this period of time, temporary benefits are payable to the injured worker. Generally, these benefits attempt to replace lost wages (and provide medical and hospitalization care) consistent with the broad purpose of workers' compensation: to award compensation (apart from medical benefits), not for the injury itself, but the disability produced by a physical injury. In Iowa, these benefits are spelled out in Iowa Code sections 85.33, 85.34, and 85.37. . . .

. . . Any disability that remains after stabilization of the condition gives rise to "either a permanent partial or a permanent total award." In other words, maximum physical recovery marks the end of the temporary disability benefits, and at that point, any permanent disability benefits can be considered.

This review of temporary and permanent disability awards reveals that a fundamental component of a permanent impairment is stabilization of the condition or at least a finding that the condition is "not likely to remit in the future despite medical treatment." In other words, stabilization is the event that allows a physician to make the determination that a particular medical condition is permanent.

The symmetry of the process reveals that a claim for permanent disability benefits is not ripe until maximum medical improvement has been achieved. Until that time, only temporary benefits are available.

*Id.* (citations omitted) (first quoting 4 Arthur Larson & Lex K. Larson, *Larson's Workers' Compensation Law* § 80.03[2], at 80-6 (2009); and then quoting American Medical Association, *Guides to Evaluation of Permanent Impairment* 27 (6th ed. 2008)). *Bell Brothers* clearly forecloses the interweaving and intermixing of temporary and permanent benefits

approved by today's opinion. Regrettably, the court today fails even to discuss *Bell Brothers*.[9]

Instead of *Bell Brothers*, the court cites to a thirty-year-old decision—*Teel v. McCord*, 394 N.W.2d 405 (Iowa 1986). Several important points about *Teel* should be noted. First, the facts of *Teel* are different from those before us today in that there were no temporary partial disability benefits. *Id.* at 406. There were simply a series of healing periods when the employee was off work. *Id.* Furthermore, in *Teel* the PPD interest payments were suspended during each of those healing periods, the upshot being that PPD benefits were not due during those periods. *Id.* Today, by contrast, the court decides that PPD should be paid continuously once the first healing period ends. In this respect, today's decision is inconsistent with *Teel*. Third, the only argument the employer raised in *Teel* was the legally insufficient one that interest on PPD benefits should commence as of the date of the *award*. *Id.* Thus, none of the issues involved in this case were squarely presented. Lastly, the language from *Teel* on which the majority relies today is simply irreconcilable with *Bell Brothers*.

In the end, today's opinion rests on a nonsequitur. The court concedes that its approach results in multiple healing periods prior to MMI, not just one healing period, even though the statute refers to "the" healing period. *See* Iowa Code § 85.34(2). This means the court must determine which healing period should be selected for the

---

[9]*Bell Brothers* highlights the practical problems with today's decision. The court holds today that PPD benefits should have commenced when Evenson first resumed working in September 2010. But how was anyone to know then that Evenson had suffered a permanent disability? That is why the law allows temporary partial disability benefits to compensate for a reduction in income until it is determined that MMI has been attained.

commencement of PPD benefits. The court then states the end of the first healing period must be chosen because each healing period ends as soon as the employee returns to work. Why? The former conclusion does not follow from the latter. To put it simply, the court has confused two issues: (1) when each healing period ends and (2) which healing period must be chosen for commencement of PPD benefits.

The worker's compensation statutes, *Presthus*, *Bell Brothers*, fairness, and logic all point in one direction: When an employee suffers an industrial injury resulting in a combination of time off work and reduced hours, and then attains MMI, the employee should receive temporary partial disability and healing period benefits for the pre-MMI timeframe, and PPD benefits commencing thereafter.

The court's opinion is not clear, but to the extent the court is indicating that penalty benefits could be awarded on any of the PPD benefits, I also disagree with that conclusion. Having modified the law as to when PPD benefits commence, it would be unfair for the court to subject the employer to a penalty for its lack of clairvoyance regarding the court's own modification of the law. *See* Iowa Code § 86.13(4) (authorizing a penalty when there was a denial or a delay of payment "without reasonable or probable cause or excuse"). The commissioner did not award any penalty on the PPD benefits, but the court today upholds a penalty on "the delayed and underpaid benefits" and remands for "a recalculation of the amount of the penalty and interest owed based on the new healing period and PPD dates."

While I join the rest of the court's opinion, I fear that the foregoing aspects of today's decision misread the statutes, unnecessarily overturn precedent, will produce confusion and double recoveries, and will ultimately require a legislative fix.

Waterman, J., joins this concurrence in part and dissent in part.