# IN THE COURT OF APPEALS OF IOWA

No. 19-1522
Filed April 14, 2021

**ELIZABETH BABKA,**
    Petitioner-Appellant,

**vs.**

**IOWA DEPARTMENT OF INSPECTIONS AND APPEALS,**
    Respondent-Appellee.
_____

    Appeal from the Iowa District Court for Polk County, Joseph Seidlin, Judge.

    A registered nurse challenges the district court's ruling affirming the determination she committed dependent adult abuse.  **REVERSED.**

    David L. Brown and Tyler R. Smith (until withdrawal) of Hansen, McClintock & Riley, Des Moines, for appellant.

    Thomas J. Miller, Attorney General, and Anagha Dixit, Assistant Attorney General, for appellee.

    Heard by Bower, C.J., and Vaitheswaran and Greer, JJ.

**GREER, Judge.**

It was alleged registered nurse Elizabeth Babka committed dependent adult abuse. Following a contested hearing, an administrative law judge (ALJ) issued a proposed decision that concluded Babka had not committed abuse. On appeal, the director of the Iowa Department of Inspections and Appeals (DIA) adopted all the facts of the proposed decision but came to the opposite conclusion—that Babka did commit dependent adult abuse. This legal determination came with no reference to relevant legal authority and was silent on how the same facts led to a different legal conclusion. Babka appealed the decision, which the district court affirmed on judicial review.[1]

As she did at the district court, Babka argues the facts do not support a legal determination she committed dependent adult abuse.[2] *See* Iowa Code § 17A.19(10)(m). She also maintains the director's decision failed to meet the statutory requirements for a final decision under Iowa Code section 17A.16(1). And she argues that, under the circumstances here, the director's failure makes the decision unreasonable, arbitrary, capricious, and an abuse of discretion, as it

---

[1] Unless otherwise specifically noted, references to Iowa Code chapter 17A are to the code in force when the petition for judicial review was filed (2019), and references to other chapters are to the code in force when the administrative proceeding was initiated (2018).

[2] In her appellate brief, Babka claims she is challenging whether substantial evidence supports a determination of fact. *See* Iowa Code § 17A.19(10)(f). But whether she committed dependent adult abuse is not a finding of fact. It is a legal determination made by applying the law defining dependent adult abuse to the facts regarding the actions Babka took on the night in question. *See id.* § 17A.19(10)(m). "[W]hen an agency decision on appeal involves mixed questions of law and fact, care must be taken to articulate the proper inquiry for review instead of lumping the fact, law, and application questions together within the evidence of a substantial-evidence issue." *Burton v. Hilltop Care Ctr.*, 813 N.W.2d 250, 259 (Iowa 2012) (citation omitted).

is unclear what legal authority the director relied on, how he interpreted that authority, and to what facts the interpretation was applied to reach the decision. *See id.* § 17A.19(10)(n).

**I. Background Facts and Prior Proceedings.**

The DIA received a complaint alleging Babka committed dependent adult abuse against a patient, V.U., during Babka's overnight shift in the psychiatric ward on December 31, 2017.[3]  Specifically, it was alleged Babka assaulted and unreasonably punished V.U.

Following an investigation, the DIA issued a "founded" report[4] of dependent adult abuse in May 2018.  It concluded, "Video evidence documents that Babka grabbed [V.U.] by the arms, lifted her up out of the recliner and forced the resident out of the chair towards her room.  Further, when [V.U.] wouldn't stay in her room, Babka administered an inappropriate medication and placed [V.U.] in seclusion."

Babka appealed, and a contested two-day hearing took place before an ALJ in September 2018.  In the November 2018 proposed decision, the ALJ reversed the DIA's determination Babka engaged in dependent adult abuse and the order to put Babka's name on the dependent adult abuse registry.  In reaching this conclusion, the ALJ found:

---

[3] It is undisputed Babka was a caretaker and V.U. was a dependent adult at the time.  *See* Iowa Code § 235E.1(1) ("'Caretaker' means a person who is a staff member of a facility or program who provides care, protection, or services to a dependent adult voluntarily, by contract, through employment, or by order of the court."), (4) ("'Dependent adult' means a person eighteen years of age or older whose ability to perform the normal activities of daily living or to provide for the person's own care or protection is impaired, either temporarily or permanently.").
[4] A founded determination means that the allegation of abuse was confirmed and Babka's name would be placed on the dependent adult abuse registry.  *See* Iowa Code § 235E.6.

V.U., the alleged dependent adult victim in this case, is a 66-year-old woman who was admitted . . . on Friday, December 22, 2017. She has been diagnosed with bipolar disorder, . . . sleep apnea, insomnia, among other conditions. . . .

. . . .

V.U. was in a "manic" state . . . . Staff nursing notes, called "Progress Notes—Encounter Notes," reflect V.U. was getting very little sleep and her agitation was increasing . . . .

. . . .

Patient Tech [Sabrina] Barnes had worked with V.U. a few days since V.U.'s admission on Friday, December 22, 2017. Ms. Barnes was aware that V.U. had not slept much on previous nights, and would often wander around the unit. V.U. would walk "laps" around the unit, then sit down and color for a while, or rest in a recliner, then get up back up and sometimes go to her room, and then come out again. Previous night staff had let V.U. sleep in a recliner out in the "dayroom," which is near the nurse's station. The nurse's station is behind glass. Patient Tech Barnes believed that [V.U.] slept maybe "15 minutes here and there."

. . . .

. . . Babka worked the 7 p.m. to 7 a.m. shift on December 30-31, 2017. Ms. Babka and Registered Nurse Daphne Booth were the license[d] nurses assigned to . . . that shift. They divided up responsibility for the 17 patients on the unit, with Babka taking responsibility for V.U. Ms. Barnes was the Patient Tech assigned to work with them.

. . . .

V.U. had been assigned to a room with a roommate, but a private room had been ordered for her beginning that night shift. Babka and Nurse Booth told V.U. at the beginning of their shift that she had a private room now and they wanted her to sleep in her room that night.

. . . .

Staff allow residents to walk around the unit and watch television in the "dayroom," until 11 p.m.—when the television is turned off. Babka and the other staff did not have a problem with V.U. being in the day room after 11 p.m., so long as she was quiet. . . .

At some point another resident—a male diagnosed with dementia—fell asleep on the couch in the dayroom. The male resident had a roommate. That patient was assigned to Nurse Booth that shift, and she did not want him disturbed because if awakened, he would get very upset and aggressive.

Between midnight and 2 a.m. V.U. kept moving about the unit. Sometimes she would sit in a recliner in the dayroom for about 15 minutes at a time, but then would get up again and loudly demand medication. [A] little before 2:30 a.m., Babka noticed that V.U. was

rocking in the recliner and appear to be getting really drowsy. The video footage of the area does not show V.U.'s face.

Babka walked up to V.U. and told her to the effect, "Why don't you go lie down in your bed." The video shows Babka standing in front of V.U. and talking to her, but there is no audio. Babka denies that she woke V.U. up. She told the DIA Surveyor that V.U. was "dozing." . . . .

V.U. did not like what Babka said to her, and started yelling and cursing at her. Babka called Nurse Booth to come over and help her with V.U.

V.U. started threatening [Babka] and Nurse Booth. Nurse Booth and Babka "nicely" told V.U. that she needed to go to her room, that they would sit with her and get her some food. They reminded her that she had a private room.

V.U. responded by yelling and screaming, questioning why the man on the couch could stay out in the dayroom, but she could not. Nurse Booth told V.U. that she needed to calm down and that she could go to her room on her own, or they would assist her. When V.U. did not respond, Nurse Booth said to the effect, that she would count to 3, and if V.U. did not get up on her own, they would go "hands on" and get her up. V.U. responded to the effect, "Go ahead and do it, bitches."

At that point—as verified by the video—Babka and Nurse Booth bent over and each put an arm under V.U.'s arms and stood V.U. up. At some point V.U. made a clenched fist and stomped on Nurse Booth's foot. When they tried to walk V.U. forward, she dropped her weight and they lowered her to the floor. Nurse Booth stepped away and called security.

. . . .

The video shows that V.U. then got up on her own and started to move toward the recliner. Babka blocked her from returning to the chair and pointed her toward her room. About 2:41 a.m., the video shows Babka walking V.U. down to her room. Another camera shows Patient Tech Barnes at 2:44 a.m. covering up the man on the couch with a blanket.

Shortly after that, the video shows V.U. leaving her room and walking down the hall. Security Guard Erik Nelson takes V.U.'s hand and she calmly walks back [to] her room.

V.U. kept wanting to leave her room. She told a security guard who came to assist that Babka "would not give me my meds."

Babka told V.U. that she had given her all the Seroquel that she could give her that day, and all she had left to give was Haldol—and that she could take it by mouth or via a shot. V.U. replied that she would just take the shot. Security Guard Nelson held V.U.'s hand, and she cooperated with the shot. Babka gave V.U. the Haldol shot in her upper left arm.

Babka noted in V.U.'s medication records that she gave her the Haldol injection at 2:46 a.m. Although Babka testified she gave V.U. a choice, she charted that she [g]ave the injection after V.U. "refused" oral medication.

V.U. remained in her room for about 15 to 20 minutes, but then came out and resumed yelling at staff. She was redirected back to her room. She stayed in her room a little longer after Patient Tech Barnes brought her a radio.

At 3:29 a.m., V.U came out to the dayroom and star[ted] yelling. She refused to be redirected. . . .

Babka then gave V.U. two choices—she could return to her room or she could go to an open seclusion room to calm down. V.U. picked the seclusion room, however as she walked her over to the seclusion room, she changed her mind and wanted to go towards the dayroom. Babka told her no, she had already picked the seclusion room and she had to stay in there until she calmed down. She walked V.U. into the seclusion room and left.

The seclusion room was not locked at that time. . . . Staff considered this "open door quiet room."

During the next 20 minutes Babka was busy with other patients. Nurse Booth stood by the seclusion room door. According to Nurse Booth, at one point V.U. was "running at me and trying to push me while she was in the seclusion room. Granted I was standing in the doorway." . . . . Patient Tech Barnes testified that when V.U. was put in the seclusion room, she was "banging around in there and screaming." Nurse Booth asked [Babka] why she just didn't call the doctor and get some medication for V.U.

[Babka] called Dr. Ouyang a little before 5 a.m. on December 31, 2017. She told the doctor that V.U. had been yelling and attempting and threatening to hit staff.

Babka documented on a "Psychiatric Restrain/Seclusion Summary" that she called Dr. Ouyang at 4:58 a.m. and told him of V.U.'s behavior that night and what PRN's had been administered to her. . . . [The doctor] gave an oral order for V.U. to have a Thorazine injection. He also gave an oral order for V.U. to be in locked seclusion until [she] could control her behavior.

V.U. cooperated when Babka gave her a shot. She testified that she gave V.U. the shot in her upper arm, but the guard indicated it was in the hip.

V.U. was officially placed in locked seclusion at 5:06 a.m. on December 31, 2017. She calmed down by 6:30 a.m. and the door was unlocked at 6:30 a.m.

(Citations omitted.)

When considering whether Babka committed dependent adult abuse, the ALJ focused on Babka's actions of putting hands on V.U. while forcing her out of the recliner when V.U. did not want to stand, giving V.U. injections of Haldol and Thorazine, and placing V.U. in seclusion.

After considering the standards in section 235E.1(5), the ALJ concluded "getting V.U. out of the recliner" was not an act of assault because, while "[t]here is no dispute . . . Babka and Nurse Booth bent over, put their hands under V.U.'s arms and stood her up," "[t]he video does not reflect the action to be yanking or pulling." The ALJ also concluded that neither giving V.U. injections nor placing her in seclusion constituted assault, because while those actions violated hospital policies, "policy violations do not automatically constitute assault" under the statute. The ALJ recognized that "it may have been more appropriate, and better judgment, for a frustrated [Babka] to let V.U. sleep in the day room" but determined "her lack of judgment does not by itself constitute unreasonable punishment." The ALJ concluded the actions Babka took following this initial escalation, the forcing V.U. out of the chair, multiple injections to calm her down, and placing her in seclusion, were not done to punish V.U.

The DIA appealed the proposed decision. In its brief to the director, the DIA argued it did not need to prove Babka intended to hurt or harm V.U. for a determination she committed dependent adult abuse. Pointing out that Iowa Code section 235E.1(5)(a)(1) includes in the definition of assault "any act which is . . . generally intended to result in physical contact which would be considered by a reasonable person to be insulting or offensive," the DIA argued Babka's actions of waking V.U. when she was not causing a disturbance and then physically removing

her from the chair met the standard for assault. The DIA also argued that Babka unreasonably punished V.U. when V.U. was forced to go into seclusion because she would not follow Babka's orders to remain in her room. In response, Babka asserted she did not have the requisite intent to assault V.U.; "[i]n raising V.U. from her recliner, [Babka] and [Nurse Booth] merely intended to move V.U. to her private room so as not to disturb the other patients." She maintained her "intent throughout the night was to deescalate her aggravated patient" and noted some of her actions were supported by order of a doctor.

In the written February 2019 decision, the director adopted the findings of fact of the proposed decision in their entirety. Even so, the director found Babka committed dependent adult abuse, stating:

> Upon reviewing the record, I conclude that the Department presented sufficient evidence to support the determination that [Babka's] actions constituted dependent adult abuse (assault and unreasonable punishment). However, the video is such a key piece of central evidence in this case that the lack of any audio recording from the dayroom incident between V.U. and [Babka] is problematic. Accordingly, I conclude that the dependent adult abuse in this case is "minor, isolated, and unlikely to reoccur." Iowa Code § 235E.2(1)(c).[5]
>
> For these reasons, I reverse the ALJ's proposed decision and modify the Department's determination to Confirmed, Not Registered.

---

[5] Iowa Code section 235E.2(1)(c) provides, in part:
> A report of dependent adult abuse that meets the definition of dependent adult abuse under section 235E.1, subsection 5, paragraph "a", subparagraph (1), subparagraph division (a) or (d), or section 235E.1, subsection 5, paragraph "a", subparagraph (3), which the department determines is minor, isolated, and unlikely to reoccur shall be collected and maintained by the department of human services as an assessment only for a five-year period and shall not be included in the central registry and shall not be considered to be founded dependent adult abuse.

Babka filed a petition for judicial review. In her brief to the district court, Babka emphasized that the director adopted the facts of the proposed decision but reversed the legal determination, stating:

> The grounds for this reversal are non-existent in the Director's order. The Director does not designate any error, either legal or factual, in [the ALJ's] proposed decision. In fact, the Director agrees that the Department's key evidence, the video surveillance, is "problematic" given that it does not show video footage of key moments and does not have audio.

Babka asserted the deficiencies in the ruling made it unreasonable, arbitrary, capricious, and an abuse of discretion. Babka also challenged the director's underlying determination that the facts supported a legal finding that Babka committed dependent adult abuse. The DIA maintained the decision should be affirmed because, "[w]hile the final order did not explain where exactly the Director disagreed with the proposed decision, the legal errors contained within the proposed decision are obvious." The DIA argued the ALJ erred by "ignoring the 'insulting or offensive' prong of the test for assault of a dependent adult" and that the facts, as adopted by the director, met this standard for assault. It also argued the director's determination Babka unreasonably punished V.U. should be affirmed because

> [w]hether Babka's actions consisted of unreasonable punishment must depend on the justification for the actions. Based on the applicable standard of contact, Babka was required to consider only V.U.'s or others' physical safety as justifications for taking actions which restrained V.U.'s movement or placed her in seclusion. The fact that Babka took these actions where V.U.'s or others' physical safety was not at risk strongly suggests some other motivation for Babka's actions. It was reasonable for the Director to conclude that the findings of fact as laid out in the Proposed Decision supported a finding that Babka unreasonably punished V.U.

At a hearing before the district court, the DIA acknowledged some limitations of the written decision but encouraged the court to affirm the ruling because, when the evidence was reviewed, there was substantial evidence to support a finding abuse was committed.

The district court affirmed the decision of the director with one exception. The district court found there was not substantial evidence for the allegations of unreasonable punishment by use of the medication injections or by use of the seclusion room. And "[t]he court under[stood] and share[d] Babka's frustration with the lack of explanation provided by the director in reversing the ALJ's proposed decision" but determined "little or no explanation is required." From its review of the record, the district court emphasized certain findings from the proposed decision, stating:

> VU was dozing or sleeping in the recliner in the dayroom;
> Ms. Babka woke or disturbed VU for the purpose of requiring her to get up from the recliner and go to her room;
> VU did not want to get up from the recliner;
> at that time, VU was not acting in a manner indicating a threat to harm herself or others;
> Ms. Babka knew VU did not want to be forced to get out of the recliner and go to her room;
> Ms. Babka intentionally put her hands on VU and lifted her out of the recliner against her will.

Based on these handpicked facts, the district court found:

> These facts would justify a conclusion that Ms. Babka committed an act generally intended to result in physical contact which would be considered by a reasonable person to be insulting or offensive. These facts would also justify a conclusion that Ms. Babka inflicted unreasonable punishment on VU. The Director's conclusion, then is not without regard to the law or underlying facts. Certainly, reasonable minds could conclude the same as did the Director. Further, the Director's application of the law to these facts would not be irrational, illogical, or wholly unjustifiable.

Babka appeals.

## II. Analysis.

Babka maintains the district court erred in affirming the director's decision. *See Langley v. Emp. Appeal Bd.*, 490 N.W.2d 300, 3020 (Iowa Ct. App. 1992) ("The scope of review in cases arising out of the Iowa Administrative Procedures Act is limited to the correction of errors at law. A district court decision rendered in appellate capacity is reviewed to determine whether the district court correctly applied the law." (citation omitted)). First, she argues the facts adopted by the director do not support a legal determination she committed dependent adult abuse. *See* Iowa Code § 17A.19(10)(m). Second, she contends the director's reversal of the legal conclusion of the proposed decision, without explanation or citation to authority, and after the wholesale adoption of the facts in the proposed decision, makes the resulting decision unreasonable, arbitrary, capricious, or an abuse of discretion and violates the statutory requirements for a final decision under section 17A.16(1). *See id.* § 17A.19(10)(n) (providing that the court may provide appropriate relief when the agency action is "[o]therwise unreasonable, arbitrary, capricious, or an abuse of discretion"). We consider Babka's second argument first.

Section 17A.16(1) requires that

> [a] proposed or final decision or order in a contested case shall be in writing or stated in the record. A proposed or final decision shall include findings of fact and conclusions of law, separately stated. . . . Each conclusion of law shall be supported by cited authority or by a reasoned opinion.

"We believe the deference courts are required to give [the director's] findings of fact in a direct appeal . . . carries with it a correlative duty on [the director's] part to

state the evidence he [or she] relies upon and specify in detail the reasons for his [or her] conclusions." *Catalfo v. Firestone Tire & Rubber Co.*, 213 N.W.2d 506, 510 (Iowa 1973). We "recognize our duty to broadly and liberally apply the [agency's] findings to uphold rather than to defeat the [agency's] decision." *IBP, Inc. v. Al-Gharib*, 604 N.W.2d 621, 634 (Iowa 2000). And we do not expect agencies to produce legal treatises for their decisions. *See Ward v. Iowa Dep't of Transp.*, 304 N.W.2d 236, 238 (Iowa 1981) (pointing out agency decision's failure to comply with statutory requirement of separately stating the facts and conclusions of law but considering the merits of the claim because "it is possible to work backward and to deduce what must have been his legal conclusions"). But the "decision must be sufficiently detailed to show the path [the director] has taken through conflicting evidence." *Catalfo*, 213 N.W.2d at 510. In addressing the application of the statute involved, we review for correction of errors at law. *State v. Lindell*, 828 N.W.2d 1, 4 (Iowa 2013).

Here, the district court reviewed the record and picked facts it decided "would justify" the conclusion reached by the director. This review is too simplistic. We are required to determine whether the director "acted arbitrarily or misapplied the law." *Catalfo*, 213 N.W.2d at 510. We cannot allow our judicial review to become meaningless. *See id.* (citing *United States v. Chi., Milwaukee, St. Paul. & Pac. R.R. Co.*, 294 U.S. 499, 511 (1935) ("We must know what a decision means before the duty becomes ours to say whether it is right or wrong."); *E.-Cent. Ass'n v. United States*, 321 U.S. 194, 212 (1944) ("We only require that, whatever result be reached, enough be put of record to enable us to perform the limited task which is ours.")).

The director's written decision here makes our charge impossible. We do not know what actions of Babka's the director concluded constituted assault and unreasonable punishment. Additionally, the legal definition requires that the abuse result from the actor's "willful misconduct or gross negligence or reckless acts or omissions." *See* Iowa Code § 235E.1(5)(a)(1). In the proposed decision, the ALJ laid out definitions for the three terms—willful misconduct, gross negligence, and recklessness—before determining Babka lacked the necessary mens rea to commit dependent adult abuse. Because the director's ruling is silent on this element, we cannot tell which—if any—of the intent elements he found to have applied to Babka's actions. *Cf. Norland v. Iowa Dep't of Job Serv.*, 412 N.W.2d 904, 909 (Iowa 1987) (noting the court "should not have to undertake such a deductive process when reviewing an agency decision" but the agency has fulfilled the requirements of section 17A.16(1) when the court is able "to work backward [from the agency's written decision] to deduce what must have been the [the agency's] legal conclusions" (alterations in original)). It is possible the director failed to consider this necessary step altogether; we cannot tell by reviewing the written ruling. Such a failure would make the decision arbitrary and capricious. *See* Iowa Code § 17A.19(10)(n); *see also Norland*, 412 N.W.2d at 912 ("The term 'arbitrary' when applied to test the propriety of agency action means the action complained of was without regard to the law or consideration of the facts of the case. In this context, 'arbitrary' and 'capricious' are 'practically synonymous.'" (citations omitted)). Likewise, the district court's analysis offered no insight into how willful misconduct, gross negligence, and reckless acts played into the final

conclusion of dependent adult abuse. So in our role we tackle these omissions to determine how they impact the final decision.

**Adult Dependent Abuse under Chapter 235E.**

But we start with what we do know here. Our legislature protects vulnerable dependent adults. To do so, the legislature established a dependent adult abuse program with a structure for identifying and addressing abuse of dependent adults. *See* Iowa Code ch. 235B. In 2008, the legislature added Iowa Code chapter 235E with a statutory framework surrounding dependent adult abuse in a facility or program.[6] *See* 2008 Iowa Acts ch. 1093, §§ 11–15. Using the later statutory authority, the DIA concluded Babka committed dependent adult abuse in the forms of assault and unreasonable punishment, under section 235E.1(5)(a)(1)(a). The DIA notice confirmed the case decision "[a]s a result of the Alleged Perpetrator/Caretaker's willful misconduct and/or gross negligence and/or reckless acts and/or omissions, the allegation is Founded."

The ALJ analyzed the standard applied to Babka's actions:

> Looking at the language in section 235E.1(5) as a whole, DIA is required to show the following in this case:
> > That Appellant Babka's physical contact with V.U. resulted from the willful misconduct or gross negligence or reckless acts of Appellant Babka;
> > and
> > That Appellant Babka intended to cause pain or injury to V.U. or intended the physical contact to be insulting or offensive to V.U.

---

[6] In chapter 235E, a "'*[f]acility*' means a health care facility as defined in section 135C.1 or a hospital as defined in section 135B.1," and a "'*[p]rogram*' means an elder group home as defined in section 231B.1, an assisted living program certified under section 231C.3, or an adult day services program as defined in section 231D.1." Iowa Code § 235E.1(6), (9).

In DIA's rules, willful misconduct is defined as "an intentional act of unreasonable character committed with disregard for a known or obvious risk that is so great as to make it highly probable that harm will follow." Gross negligence has been defined as "an extreme departure from the ordinary standard of care." "Recklessly" is statutorily defined to mean "a gross deviation from the standard conduct that a reasonable person would observe in the situation." The term "gross deviation" is not further defined, but other jurisdictions have stated that a failure to perceive a substantial risk is a gross deviation from the standard of ordinary care that a reasonable person would observe in the situation.

The use in Iowa Code 235E.1(5) of these terms—willful misconduct, gross negligence, recklessly, and gross deviation— demonstrates that more than mere negligence is required. A caretaker cannot *accidentally* commit an assault in the dependent adult abuse context.

(Citations omitted). Yet, in its brief, the DIA argues the ALJ "ignored half of the statute defining the dependent adult abuse." The DIA contends "[i]t is not only 'pain or injury' that would result in a finding of assault, but it is also 'physical contact which would be considered by a reasonable person to be insulting or offensive.'" The DIA advocates for a general intent standard suggesting Babka did not have to intend to assault V.U. but instead she "need only to intend to do the act that constitutes the assault" and thus the ALJ applied the wrong analysis. The DIA also maintains the ALJ incorrectly determined Babka's actions did not amount to unreasonable punishment.

Under the allegations here, "dependent adult abuse"[7] means

---

[7] DIA addresses dependent adult abuse in its rules as:
*"Dependent adult abuse"* means any of the following as a result of the willful misconduct or gross negligence or reckless act or omission of a caretaker, taking into account the totality of the circumstances: physical injury, unreasonable confinement, unreasonable punishment, assault, sexual offense, sexual exploitation, exploitation, neglect, or personal degradation.
Iowa Admin. Code r. 481-52.1.

1. Any of the following *as a result of the willful misconduct or gross negligence or reckless acts or omissions of a caretaker*, taking into account the totality of the circumstances:

a. A physical injury to, or injury which is at a variance with the history given of the injury, or unreasonable confinement, unreasonable punishment, or assault of a dependent adult which involves a breach of skill, care, and learning ordinarily exercised by a caretaker in similar circumstances. "Assault of a dependent adult" means the commission of any act which is generally intended to cause pain or injury to a dependent adult, or which is generally intended to result in physical contact which would be considered by a reasonable person to be insulting or offensive or any act which is intended to place another in fear of immediate physical contact which will be painful, injurious, insulting, or offensive, coupled with the apparent ability to execute the act.

Iowa Code § 235E.1(5)(a)(1)(a) (emphasis added).

Only the ALJ applied the qualifying language defining the nature of the act or omission required to constitute an abuse. The director, the district court, and the DIA are all silent on these hurdles to reach a finding of abuse. We ask what did the legislature intend by requiring the act or omission to result from willful misconduct, gross negligence, or reckless acts?

Granted, we find no case law guidance about how to apply this section of the Iowa Code. So we begin our quest with the text of the statute. *See Gardin v. Long Beach Mortg. Co.*, 661 N.W.2d 193, 197 (Iowa 2003). The purpose of statutory interpretation is to determine legislative intent. *See, e.g.*, *In re Estate of Bockwoldt,* 814 N.W.2d 215, 223 (Iowa 2012). "We do not search beyond the express terms of a statute when that statute is plain and its meaning is clear." *Gardin*, 661 N.W.2d at 197. We also read a statute as a whole to reach "a sensible and logical construction." *Id.* (citation omitted). When the debate is over a word or phrase, we examine the context in which it is used. *Exceptional Persons, Inc. v. Iowa Dep't of Human Servs.*, 878 N.W.2d 247, 251 (Iowa 2016). "We give words

their ordinary and common meaning by considering the context within which they are used, absent a statutory definition or an established meaning in the law." *Doe v. Iowa Dep't of Human Servs.,* 786 N.W.2d 853, 858 (Iowa 2010). "We also consider the legislative history of a statute, including prior enactments, when ascertaining legislative intent." *Id.* "When we interpret a statute, we assess the statute in its entirety, not just isolated words or phrases." *Id.* Likewise, we consider "the statute's 'subject matter, the object sought to be accomplished, the purpose to be served, underlying policies, remedies provided, and the consequences of the various interpretations.'" *State v. Dohlman,* 725 N.W.2d 428, 431 (Iowa 2006) (citation omitted).

From our viewpoint, use of terms such as "gross negligence," "reckless" behavior, and "willful misconduct" demands behavior more than what is negligent or a misinterpretation of a work policy. And the DIA's internal definitions suggest the same. Those terms are defined by the DIA:

> *"Gross negligence"* means an act or omission that signifies more than ordinary inadvertence or inattention, but less than conscious indifference to consequences; and, in other words, means an extreme departure from the ordinary standard of care.
> . . . .
> *"Recklessly"* means that a person acts or fails to act with respect to a material element of a public offense, when the person is aware of and consciously disregards a substantial and unjustifiable risk that the material element exists or will result from the act or omission. The risk must be of such a nature and degree that disregard of the risk constitutes a gross deviation from the standard conduct that a reasonable person would observe in the situation.
> . . . .
> *"Willful misconduct"* means an intentional act of unreasonable character committed with disregard for a known or obvious risk that is so great as to make it highly probable that harm will follow.

Iowa Admin. Code r. 481-52.1.

Along with the general meanings of these terms, other references suggest the intentional nature intended. For example, gross negligence is defined elsewhere by our legislature as "such lack of care as to amount to wanton neglect for the safety of another." Iowa Code § 85.20(2). Recklessness is "conduct evidencing either a willful or wanton disregard for the safety of others." *State v. Kernes*, 262 N.W.2d 602, 605 (Iowa 1978). When the statutory meaning of willful misconduct is reviewed, we have said it requires a "willful intent to do wrong [and] an evil purpose upon the part of the accused, . . . by clear, convincing, satisfactory evidence." *State v. Watkins,* 914 N.W.2d 827, 837 (Iowa 2018) (alterations in original) (citation omitted).

Likewise, we gain confidence in our analysis by reviewing our supreme court's treatment of the similar standards under chapter 235B. In *Wyatt v. Iowa Department of Human Services*, a nurse tried to muffle noise from a distressed patient with a pillow to avoid waking a seriously ill patient next door. 744 N.W.2d 89, 91 (Iowa 2008).[8] As here, after accepting the factual findings of the ALJ, the director reversed the ALJ decision, which found no abuse, concluding instead that the placing of the pillow over the mouth of the dependent adult was not part of the care plan and a reasonable person would consider that physical contact as insulting or offensive. *Id.* at 92. The district court disagreed with the director and found no abuse occurred because Wyatt acted with no specific intent to assault the resident. *Id.* at 93. In *Wyatt*, under chapter 235B the dependent adult abuse

---

[8] *Wyatt* came before Iowa Code chapter 235E was enacted.

definition had different qualifying language to describe the actor's behavior. Section 235B.2(5)(a)(1)(a) reads

> "Dependent adult abuse" means:
> (1) Any of the following as a result of the willful or *negligent* acts or omissions of a caretaker:
> (a) Physical injury to, or injury which is at a variance with the history given of the injury, or unreasonable confinement, unreasonable punishment, or assault of a dependent adult.

(Emphasis added.) Much like the argument here, the DIA argued the definition allowed for a lesser showing that the intended physical conduct could be objectively viewed as insulting or offensive as opposed to a requirement that the actor have a specific intent to offend or insult the patient. *Wyatt*, 744 N.W.2d at 94. Despite the reference to "negligent" in the definition, *Wyatt* clarified that because the internal rules defined assault as that defined in Iowa Code section 708.1,[9] it would apply the elements from Iowa case law requiring a specific intent to commit the act. *Id.* at 94–95 (confirming the State must show not only that the actor intended to make physical contact, but that they intended that physical contact to be insulting or offensive for a finding of assault (citing *State v. Keeton*, 710 N.W.2d 351 (Iowa 2006)). True, while the internal rules involving chapter 235E do not directly reference the criminal code, the dependent adult abuse definition in

---

[9] Iowa Administrative Code rule 441-176.1(2) provides, "'*Assault*' means 'assault' as defined in Iowa Code section 708.1." And section 708.1(2)(a) provides:
> A person commits an assault when, without justification, the person does any of the following:
> a. Any act which is intended to cause pain or injury to, or which is intended to result in physical contact which will be insulting or offensive to another, coupled with the apparent ability to execute the act.
> b. Any act which is intended to place another in fear of immediate physical contact which will be painful, injurious, insulting, or offensive, coupled with the apparent ability to execute the act.

chapter 235E contains similar language to section 708.1.[10]  And unlike chapter 235B where there is reference to negligent acts, the language of chapter 235E seems to require some component of intentional behavior.  Moreover because of the required showing of *willful misconduct, gross negligence, or reckless acts or omissions* of the actor in chapter 235E, we cannot accept DIA's argument that a general intent to commit an assault is the appropriate standard required.

Relying on the fact finding performed by the ALJ and incorporated in full into the final order of the director, we apply our analysis of the statutory language to the conclusion of the director and district court as to each allegation of abuse.

**Assault: Section 235E.1(5)(a)(1)(a).**

We start with the allegations themselves.  Characterizing the actions as insulting or offensive, the DIA contends the assault allegations derive from Babka removing V.U. from the recliner, physically restraining her in the seclusion room, and administering medication through injection.  Babka argues any actions by her focused on good care for the patient and were not done with an intent to harm.  First, V.U. had been on the ward for several days, was suffering from a manic

---

[10] *Compare* Iowa Code § 708.1(2)(a), (b) (defining assault in a criminal context as "[a]ny act which is intended to cause pain or injury to, or which is intended to result in physical contact which will be insulting or offensive to another, coupled with the apparent ability to execute the act" and "[an]y act which is intended to place another in fear of immediate physical contact which will be painful, injurious, insulting, or offensive, coupled with the apparent ability to execute the act"), *with id.* § 235E.1(5)(a)(1)(a) (defining dependent adult abuse, in part, as "the commission of any act which is generally intended to cause pain or injury to a dependent adult, or which is generally intended to result in physical contact which would be considered by a reasonable person to be insulting or offensive or any act which is intended to place another in fear of immediate physical contact which will be painful, injurious, insulting, or offensive, coupled with the apparent ability to execute the act").

bipolar episode, and had slept for less than two and a half hours each night. Earlier in the day, V.U. had been cussing and threatening to hit staff in her agitated state. Knowing it would help her condition if she slept, staff reserved a private room for V.U. that evening. The private room would prevent waking the other residents, which had happened with V.U.'s roommate in the past, and would also encourage V.U. to sleep. A video from the common area where V.U. sat in the recliner has no audio. Babka testified that V.U. was drowsy and not yet asleep when she approached to direct her once again back to the private room.[11] As happened earlier in the shift with other staff, V.U. became agitated with Babka and the other nurse who came to help. The two nurses used a transport hold to lift her from the chair and redirect her to the private room.

Like *Wyatt*, Babka also expressed concern for other patients on the unit. On top of the concerns about V.U., a patient sleeping in the common area on the couch could not be in his room with a roommate and if awakened would become agitated and aggressive. V.U.'s behavior risked awakening that patient. Babka also had concerns V.U. would wake other patients asleep in their rooms with her yelling at the nurses. The situation escalated when V.U. threatened one of the nurses and stomped on her foot. With all of those concerns at hand, Babka directed V.U. to her private room. While Babka admitted later there may have been another way to handle the evening, we do not find her behavior constitutes an intentional act or reckless disregard for the patient.

---

[11] There is a conflicting statement from Babka that she woke V.U., but Babka also pointed to movement and rocking from the patient that occurred shortly before Babka engaged the patient. Regardless, the ALJ explicitly did not conclude Babka "woke V.U. up from a sound sleep."

We look to the totality of the circumstances as the statute directed. Babka was a seasoned nurse with no previous disciplinary complaints. Babka's continuous direction of V.U. back to the private room based on the nurse's concern for V.U.'s need for sleep met a goal for V.U.'s care. V.U.'s manic condition would benefit from more sleep than an hour or two each night. Likewise, Babka reasonably explained that the escalation and increased volume of V.U. led to the decision to use the quiet time out room. Babka inflicted no bruises or physical injuries to V.U. No one ever interviewed V.U. or her family about the incident. V.U. continually asked for more medications. The first medication available was under PRN status and could be given orally or by injection. Babka testified she offered it orally or through injection and V.U. chose by injection. The video shows V.U. calmly accepting the injection. Babka's call to the psychiatrist led to the final injection and the closed seclusion room as the psychiatrist ordered. Even the district court found there was little factual support for the allegation that Babka committed abuse by administering shots to V.U. The video is inconclusive to dispute Babka's version of the events. The testimony of Barnes was not found to be credible. Babka's supervisor adamantly testified there was no malice on the part of Babka in her actions and other than some "coaching" saw no reason to punish her. Under the appropriate statutory standard and after considering the totality of the circumstances, we find there is not substantial evidence of an assault on V.U. by Babka.

The DIA also emphasizes Babka's choices that evening violated policies established by the facility. In a work environment, we acknowledge the possibility that directives might collide with decisions made in the moment. But the DIA

cannot couple the failure to meet best work practices with Babka's behavior to extract an assault finding. Here, the next day after a group meeting with the supervisor and all staff involved in the incident, actions were reviewed and the meeting provided a "teaching moment." No one was sanctioned after that meeting. No employment action occurred until after the abuse notification issued. While the failure to follow exactly the work policies might show poor judgment, an assault does not automatically follow from that characterization. We cannot base an assault finding on a failure to exercise work policies alone. Because the DIA failed to show Babka met the willful misconduct, gross negligence, or reckless acts or omissions standards constituting the requisite intent to assault V.U., we vacate the judgment of the district court on those grounds.

**Unreasonable Punishment: Section 235E.1(5)(a)(1)(a).**

As for the second allegation, the DIA also cited Babka for unreasonable punishment of V.U. Again, this citation is qualified by the *willful misconduct, gross negligence, or reckless acts or omissions* of the actor standards in chapter 235E. Under the Administrative Code, "unreasonable punishment" means

> a willful act or statement intended by the caretaker to punish, agitate, confuse, frighten, or cause emotional distress to the dependent adult. Such willful act or statement includes but is not limited to intimidating behavior, threats, harassment, deceptive acts, or false or misleading statements.

Iowa Admin. Code r. 481-52.1. On its face, the rule provides for intentional conduct by the caretaker. Babka testified that V.U. refused to return to her private room but was still yelling and agitated. Babka offered a quiet room—the seclusion room—which V.U. agreed to use. An internal work policy provided for a "time out" as a "procedure used to assist the individual to regain emotional control by

removing the individual from his/her immediate environment and restricting the individual to a quiet area or unlocked quiet room." Babka opted for that option to help calm V.U., keep her from waking others, and avoid the possibility V.U. might act on her threats to harm the nurses. It was not until the psychiatrist ordered the locked isolation that the seclusion room was locked. We agree with the district court that there is not substantial evidence to support unreasonable punishment by use of the isolation room.

To finish our review, we cannot help but note the director's final decision offers no guidance on the application of the law to the facts developed here. The ALJ's decision does. The ALJ recited eleven pages of specific factual findings. The director incorporated those "accurate" findings. Likewise, the district court commented, "[t]here is no dispute as to the factual findings set forth by the [ALJ]" and then referenced several of those findings in its decision. We recognize the ALJ saw the witnesses in "real time" and could and did make credibility findings. On our review, we see no reason to disagree with the facts and credibility determinations as made and summarized by the ALJ and find them supported by the record.

## III. Conclusion.

We reverse the district court and dismiss all allegations of dependent adult abuse against Babka. We order the DIA to take any action necessary to implement this decision.

**REVERSED.**

Bower, C.J., concurs; Vaitheswaran, J., concurs specially.

**VAITHESWARAN, Judge** (concurring specially).

I specially concur. Elizabeth Babka argues "[a]gencies cannot arbitrarily make a finding of abuse without evidentiary support." This assertion implicates the substantial evidence standard of review. *See* Iowa Code section 17A.19(10)(f). "Evidence is substantial if 'the quantity and quality of evidence . . . would be deemed sufficient by a neutral, detached, and reasonable person, to establish the fact at issue when the consequences resulting from the establishment of that fact are understood to be serious and of great importance.'" *Gumm v. Easter Seal Soc'y of Iowa, Inc.*, 943 N.W.2d 23, 33 (Iowa 2020) (alteration in original) (quoting Iowa Code § 17A.19(10)(f)(1)).

The administrative law judge found "the evidence inconclusive that Appellant Babka woke V.U. up from a sound sleep." The administrative law judge also found the evidence did "not support the allegations that [Babka] went 'hands on' in getting V.U. out of the recliner in a deliberately hurtful manner." Finally, the administrative law judge discredited the statements of the patient technician who stated Babka "yanked" and "grabbed" V.U. I believe the administrative law judge's findings of fact—adopted in full by the director—were supported by substantial evidence. *See Evenson v. Winnebago Indus., Inc.*, 881 N.W.2d 360, 366 (Iowa 2016) ("An agency's decision does not lack substantial evidence because inconsistent conclusions may be drawn from the same evidence." (quoting *Coffey v. Mid Seven Transp. Co.*, 831 N.W.2d 81, 89 (Iowa 2013))); *cf. Olutunde v. Iowa Dep't of Human Servs.*, No. 17-1650, 2018 WL 6422881, at *6 (Iowa Ct. App. Dec. 5, 2018) (finding "substantial evidence in the

record to support DHS's conclusion" that a person "did not receive all of her medication as prescribed and this was due to negligent supervision and training by" a caretaker); *Menegbo v. Iowa Dep't of Inspections & Appeals*, No. 07-0170, 2007 WL 4553345, at *3 (Iowa Ct. App. Dec. 28, 2007) (finding substantial evidence to support the department's "findings that [the caretaker] committed dependent adult abuse"); *Sciacca v. Iowa Dep't of Human Servs.*, No. 06-1276, 2007 WL 2004531, at *3 (Iowa Ct. App. July 12, 2007) (concluding substantial evidence supported the agency's findings that the caretaker committed dependent adult abuse); *but see Mosher v. Dep't of Inspections & Appeals, Health Facilities Div.*, 671 N.W.2d 501, 518 (Iowa 2003) (concluding agency's finding that a person was a dependent adult was "not supported by substantial evidence").

That said, I do not believe those fact findings support the director's determination that Babka committed dependent adult abuse. I concede the department is clearly vested with discretion to apply law to fact, rendering our review subject to the more deferential "irrational, illogical, or wholly unjustifiable" standard. *See* Iowa Code § 17A.19(10)(m); *Banilla Games, Inc. v. Iowa Dep't of Inspections & Appeals*, 919 N.W.2d 6, 18 (Iowa 2018). But even after affording the director the deference he is due, I am hard-pressed to divine how Babka's conduct as found by the director resulted from "willful misconduct or gross negligence or reckless acts or omissions." *See* Iowa Code § 235E.1(5)(a)(1); *accord AOL LLC v. Iowa Dep't of Revenue*, 771 N.W.2d 404, 410 (Iowa 2009) (concluding the petitioner met the "demanding burden" of establishing the department's application of law to fact was irrational, illogical, or wholly unjustifiable); *Greenwell v. Emp. Appeal Bd.*, 879 N.W.2d 222, 228 (Iowa Ct. App.

2016) (concluding agency improperly applied law to fact in determining reoccurring acts of negligence satisfied the misconduct standard); *cf. Sciacca*, 2007 WL 2004531, at *3 (concluding "the agency's determination that [caretaker's] actions constituted assault was not 'irrational, illogical, or wholly unjustifiable'").

Finally, to the extent the director's decision involved an interpretation of chapter 235E, I am persuaded the interpretation was either "irrational, illogical, or wholly unjustifiable" under the more deferential standard or erroneous under the less deferential standard. *See* Iowa Code § 17A.19(10)(c), (*l*); *Christensen v. Iowa Dep't of Revenue*, 944 N.W.2d 895, 899–900 (Iowa 2020); s*ee also Wyatt v. Iowa Dep't of Human Servs.*, 744 N.W.2d 89, 94–95 (concluding the State erred in interpreting the intent element of assault in the definition of dependent adult abuse); *Burrage v. Iowa Dep't of Inspections & Appeals*, No. 12-2007, 2013 WL 5229773, at *1 (Iowa Ct. App. Sept. 18, 2013) (concluding agency erred in interpreting the definition of dependent adult abuse).

For these reasons, I concur in reversal of the agency decision.